UTAH STATE ROAD COMMISSION,
Plaintiff and Respondent,

v.

Arnold FRIBERG and Hedve Friberg, his
wife, and Tracy Collins Bank and Trust
Company, Defendants and Appellants.

No. 17275.

Supreme Court of Utah.

May 1, 1984.

Robert S. Campbell, E. Barney Gesas, Roy B. Moore, Salt Lake City, for defendants and appellants.

David L. Wilkinson, Atty. Gen., Donald S. Coleman, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

STEWART, Justice:

The Utah State Road Commission (hereafter "the State")[1] commenced this action June 23, 1972, to condemn a part of real property owned by Arnold and Hedve Friberg. The property was to be used for construction of the southeast segment of I-215, a belt-loop freeway project in Salt Lake County. The trial court granted an order of immediate occupancy in December, 1972, but for various reasons discussed below, the completion of the condemnation proceedings was delayed, and the Fribergs remained in possession pursuant to a stipulation until approximately March 15, 1980. The defendants contend that after June, 1972, the value of the Fribergs' property appreciated substantially. Prior to a trial to determine compensation to be held in 1980, the Fribergs moved to have the property valued as of the date the State finally established its legal right to condemn, December 12, 1979. The trial court ruled that the property was to be valued when summons was served pursuant to U.C.A., 1953, § 78-34-11, some seven and one-half years earlier. Because of the importance of the question involved, this Court granted leave to file an interlocutory appeal.

The Fribergs' contention on appeal is that § 78-34-11, which states that the assessment of compensation and damages in a condemnation action shall be deemed to accrue as of the date of service of summons, does not necessarily fix the date of valuation as of that date when there has been a long delay in the entry of a final decree and the property has substantially appreciated in value in the intervening time. Alternatively, they argue that if § 78-34-11 does require valuation in all cases to be determined as of the date of service of summons, that section is unconstitutional as applied to the facts of this case. The State's position is threefold: (1) § 78-34-11 fixes valuation as of the date of service of summons irrespective of delay in the entry of a final decree; (2) the Fribergs' property should be valued as of that date in any event because the order for immediate occupancy, entered shortly after service of process, established the State's right to condemn and occupy the Fribergs' property; and (3) in any event, the Fribergs were responsible for the delay in prosecuting this action and should not be permitted to profit from that delay.

## I. THE FACTS

The Fribergs owned 5.33 acres located in the east Cottonwood area of the Salt Lake Valley, where they lived for some 20 years. In June, 1972, the State commenced judicial proceedings to condemn the westerly 2.58 acres of the Friberg property. In August, 1972, the Fribergs filed their answer, alleging that the State had failed to comply with statutory and jurisdictional requirements necessary to establish its right to condemn the Friberg property and therefore had no authority to condemn the property.

The parties by a stipulation dated December 6, 1972, agreed that an order of immediate occupancy could be entered, and on December 14, 1972, some three months after the Fribergs filed their answer, the district court entered an order granting the State immediate occupancy, *pendente lite.* The order also incorporated the terms of a stipulation between the parties which provided that (1) the State would deposit with the clerk of the district court $80,800 payable immediately to the plaintiffs; (2) the

---

1. The Utah Department of Transportation is the successor agency to the Utah State Road Commission. Under Utah law, a number of governmental and private entities have been granted the power to take private property by eminent domain. In this opinion, we use the term "State" to refer to the plaintiff in this action and to condemnors generally where the text indicates that the term should be so construed since the principles announced herein should apply irrespective of who the condemnor is.

Fribergs could remain on the property rent-free until September 1, 1973, and thereafter on a month-to-month basis; and (3) the Fribergs were entitled to thirty days' notice before being required to vacate the property. The Fribergs left the funds on deposit with the court, and thereby preserved their right to challenge the authority of the State to condemn the property.[2]

On August 14, 1973, after the federal lawsuit referred to below was filed, the State notified the Fribergs that they were to vacate the premises by October 1, 1973, but also indicated that the Fribergs could remain in possession under certain conditions. Apparently because of uncertainty that their property would in fact be utilized for the specified project, the Fribergs, in response to the notice to vacate, moved to dismiss the condemnation proceeding. The motion was denied when the State agreed that the Fribergs could remain in possession as long as possible.

On July 13, 1973, an action was commenced in the United States Federal District Court for the District of Utah by a group of citizens from the Cottonwood area in Salt Lake County who opposed the alignment of the proposed freeway through the suburban area in which they resided. The action sought to enjoin the State from further construction of the freeway until an Environmental Impact Statement (E.I.S.) was filed pursuant to the National Environ-mental Policy Act of 1969, § 2, *et seq.*, 83 Stat. 852, 42 U.S.C. § 4321, *et seq.* (1976). The Fribergs were among the named plaintiffs who filed the federal action. The State admitted that it had not filed an E.I.S. In January, 1974, the federal court ordered the State to prepare and file an E.I.S. and enjoined the State, pending the filing of an E.I.S., from performing any further construction activities related to the belt-loop project.[3] Some four years later, the State filed an E.I.S., which was finally approved by the Federal Highway Administration on February 7, 1978, approximately five years and eight months after service of the summons and complaint in the instant case.

For more than a year following the approval of the E.I.S., the Commission did nothing to proceed with construction of I-215 in the area near the Friberg property and took no action to have the Fribergs vacate the property. Although the record is not entirely clear on the point, the reason for this delay appears to have been the lack of funds for the project. In any event, the delay was not attributable to the Fribergs, although they clearly wanted to remain in possession as long as possible.

On February 6, 1979, approximately ten months after approval of the E.I.S., a second federal action challenging the adequacy of the E.I.S. was commenced by Cottonwood, Inc., a neighborhood citizens' group

---

**2.** U.C.A., 1953, § 78–34–9 provides for a waiver of all defenses except for a claim of greater compensation if the deposit is withdrawn. It states in pertinent part:

The plaintiff may move the court or a judge thereof, at any time after the commencement of suit, on notice to the defendant, ... for an order permitting the plaintiff to occupy the premises sought to be condemned pending the action, including appeal, and to do such work thereon as may be required. The court or a judge thereof shall take proof ... of the value of the premises ... and of the damages which will accrue *...*, and of the reasons for requiring a speedy occupation, and shall grant or refuse the motion according to the equity of the case.... A payment to a defendant [of the value of the property] shall be held to be an abandonment by such defendant of all defenses excepting his claim for greater compensation.... Upon the filing of the petition for immediate occupancy the court shall fix the time within which, and the terms upon which, the parties in possession shall be required to surrender possession to the plaintiff.

**3.** The E.I.S. was required because the State utilized federal matching funds for construction of the freeway. The State did not contest the requirement that it prepare an E.I.S., although on this appeal it contends that it voluntarily decided to comply with the Environmental Policy Act even though it was not legally required to do so. The State's contention is that the National Environmental Policy Act became effective after the initiation of this project and therefore was not applicable. That point was not litigated in the federal court proceeding, and it is not pertinent here. The critical point is the entry of the federal injunction against further action in connection with the building of I–215.

from the same general area as the Fribergs. The Fribergs were neither members of Cottonwood, Inc., nor parties to the action, although they did donate funds to the organization. On May 7, 1979, the federal district court again enjoined the State from undertaking further actions with respect to the I–215 project pending a determination of the sufficiency of the E.I.S. The State did not oppose the issuance of the injunction. On October 31, 1979, that court held that the E.I.S. was legally sufficient and dissolved the injunction.

Notwithstanding the delays caused by the lawsuits, it was not until approximately mid-November, 1979, that the Utah Department of Transportation[4] completed the "details for the final design of the north-south segment of the Southeast Quadrant between 4500 South and 6400 South," the segment for which the Friberg property was needed.

On September 19, 1979, while the federal district court injunction was still in effect in the Cottonwood case, the Fribergs filed a motion in the instant case to dismiss the complaint based on the State's failure to prosecute. The Fribergs contended that the property had appreciated substantially in value during the long interval between the commencement of the condemnation action in June, 1972, and their filing of the motion to dismiss and that it would be unfair to fix compensation as of a time some seven years earlier. In October, 1979, the trial court denied the Fribergs' motion to dismiss on the ground that the delay in bringing the case to a conclusion had resulted from the Fribergs' direct and indirect support of the two federal lawsuits.

Shortly after that ruling, the State served the Fribergs with a notice to vacate the premises in compliance with the December 14, 1972 order of immediate occupancy. The Fribergs continued to resist and again asserted that the State had not proved the jurisdictional prerequisites necessary to empower the State to condemn the Fribergs' property.[5] Specifically, the Fribergs asserted that there had been no evidence relating to the public necessity for taking their property or the relative importance of the public good and private injury. The Fribergs also contended that resolution of the Cottonwood, Inc. case, which was at that time still pending in the federal district court, might result in the proposed highway project's not going forward and that any action by the state court should await the outcome of the federal court action.

In December, 1979, after the conclusion of the Cottonwood, Inc. case and the dissolution of the federal injunction, the parties entered into a stipulation that was incorporated into a court order dated December 12, 1979. That order established the State's right to condemn and reserved for later determination the amount of compensation to be awarded and the date for determining valuation. The order also directed the Fribergs to vacate the premises on or before March 15, 1980, and the disbursement to the Fribergs of the $80,800 the State had deposited with the court. The order specifically states that it was made without prejudice to the Fribergs' contentions as to the compensation issues.

4. See footnote 1, *supra*.

5. The conditions precedent to a taking are established by U.C.A., 1953, § 78–34–4:

Before property can be taken it must appear:
(1) That the use to which it is to be applied is a use authorized by law;
(2) That the taking is necessary to such use; and
(3) If already appropriated to some public use, that the public use to which it is to be applied is a more necessary public use.

In 1981, the Legislature amended § 78–34–4 to state:
"(3) That construction and use of all property sought to be condemned will commence within a reasonable time as determined by the court, after the initiation of proceedings under this chapter." The old section (3) became the new section (4). In addition, the Legislature enacted § 78–34–19, which provides for an action to set aside condemnation proceedings for failure to commence or complete construction within a reasonable time.

The Fribergs' motion to fix the valuation date as of the date the right to condemn was established, December 12, 1979, rather than the date of service of process was denied by the trial court on the ground that § 78-34-11 required that the value of the Friberg land be determined as of June 23, 1972, and this appeal followed.

## II. JUST COMPENSATION AND THE VALUATION OF PROPERTY

■ Article I, § 22 of the Utah Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." The constitutional requirement of just compensation derives "as much content from the basic equitable principles of fairness as it does from technical concepts of property law," when the State takes private property for the public welfare. *United States v. Fuller*, 409 U.S. 488, 490, 93 S.Ct. 801, 803, 35 L.Ed.2d 16 (1973). For compensation to be fair and just, it must reflect the fair value of the land to the landowner. "Just compensation means that the owners must be put in as good a position money wise as they would have occupied had their property not been taken." *State v. Noble*, 6 Utah 2d 40, 43, 305 P.2d 495, 497 (1956).

■ A number of factors may affect the value of property taken pursuant to condemnation proceedings, including the nature of the legal procedures established for taking private property. A critical factor is the date fixed for valuing property in relation to when the condemnor acquires title, or in this case, when entitlement to condemn is established. A substantial interval between the date of valuation and the latter date may call in question the fairness of the valuation, especially when the value of the property has been substantially affected in the period between valuation and the actual taking.

Because an extraordinary delay occurred in the instant case after the statutory date fixed to value the Friberg property and the State established its right to condemn, the initial issue to be determined, assuming at this point that defendants did not cause the delay, is whether U.C.A., 1953, § 78-34-11 requires the valuation to be determined as of the date of service or whether it may allow valuation at some time other than when process was served. Section 78-34-11 states that the right to compensation and the date for assessing compensation shall be deemed to accrue as of the date of service of summons:

> For the purpose of assessing compensation and damages, the right thereto *shall be deemed to have accrued at the date of the service of summons, and its actual value at that date shall be the measure of compensation for all property to be actually taken*, and the basis of damages to property not actually taken, but injuriously affected, in all cases where such damages are allowed, as provided in the next preceding section [78-34-10]. No improvements put upon the property subsequent to the date of service of summons shall be included in the assessment of compensation or damages. [Emphasis added.]

All the cases that have heretofore been decided under this section or its predecessor have relied upon the date of service of summons in determining valuation. *E.g.*, *City of South Ogden v. Fujiki*, Utah, 621 P.2d 1254 (1980); *State ex rel. Road Commission v. Wood*, 22 Utah 2d 317, 452 P.2d 872 (1969); *State ex rel. Engineering Commission v. Peek*, 1 Utah 2d 263, 265 P.2d 630 (1953); *Oregon Short Line Railroad Co. v. Jones*, 29 Utah 147, 80 P. 732 (1905). In none of these cases, however, was the delay in any degree comparable to the instant case.[6]

6. In *City of South Ogden v. Fujiki*, Utah, 621 P.2d 1254 (1980), cited above, the condemning authority did not take possession of the land until a final judgment was entered. The landowner claimed that it was a denial of just compensation not to award interest on the compensation award from the date of service of process

because the land had appreciated from 15% to 20% between the service of summons and the final judgment. Because the City had not obtained an order of immediate occupancy, the Court held that § 78-34-9 only authorized interest from the date of the City's actual occupation and that the denial of interest did not constitute

We are, of course, constrained to construe § 78–34–11 within the limitations of constitutional requirements. When valuation is fixed at a date prior to the actual taking and the value of the property increases during a prolonged condemnation proceeding so that the valuation does not reflect a fair valuation of the property and does not therefore constitute "just compensation," the statute fixing the time of valuation is unconstitutional as applied. *Orono-Veazie Water District v. Penobscot County Water Co.*, Me., 348 A.2d 249 (1975). *Accord State v. Griggs*, 89 Ariz. 70, 358 P.2d 174 (1960); *Sanitary District of Chicago v. Chapin*, 226 Ill. 499, 80 N.E. 1017 (1907).[7] A leading treatise in the area of eminent domain law, 3 *Nichols on Eminent Domain* § 8.5[2], 8–108 to 8–111 (3d ed. 1981), states:

> In several states it is held that the filing of the petition to condemn, being the first actual step toward devoting the property to a public use, marks a point of time that is as fair and just to both parties for fixing the value of the property as any that could be selected, and it has, consequently, been adopted as the established date as of which damages are assessed. In such jurisdictions, however, if a corporation unreasonably delays the prosecution of its petition while the land is advancing in value, the application of the rule would work great wrong and injustice to the owner, and the petitioner would be able to acquire the property at much less than its value at the date of the taking.... Where the statute provides for the date of valuation at the initial step in the acquisition process, such as upon the passage of a resolution authorizing the condemnation, and then permits a protracted period of time for the prosecution of the proceeding, during

which time the value of the property may rise or fall, the statute is unconstitutional as conflicting with the·constitutional concept of "just compensation".

To comport with constitutional requirements in a particular case, it is necessary, therefore, to consider whether the protraction of judicial proceedings and other circumstances that affect the value of the land have had such an effect as to make a valuation as of a statutorily determined date unfair. In *Uvodich v. Arizona Board of Regents*, 9 Ariz.App. 400, 453 P.2d 229, 235 (1969), the court, construing a statute similar to Utah's, addressed the issue of the fairness of valuing property that had depreciated as a result of the taking:

> *State v. Hollis* [93 Ariz. 200, 379 P.2d 750 (1963) ] recognizes that arbitrary application of A.R.S. § 12–1123 [setting the valuation date of condemned property at the time of service of summons], is not required where application of the statute would result in unjust compensation to the property owner. The logical conclusion, therefore, is that the time as of which the evaluation of the property should be made must comport with the peculiar facts and circumstances of the case so as to assure the property owner compensation which is just, as contemplated by the Arizona Constitution.

*See also State v. Hollis*, 93 Ariz. 200, 379 P.2d 750 (1963).

In a similar vein, *Board of County Commissioners of Garfield County v. Delaney*, 41 Colo.App. 548, 592 P.2d 1338 (1978), held that a statute requiring the determination of valuation as of the date of the order of possession could not be construed strictly when the result would be fundamentally unfair to the expropriated landowner. *Cf.*

---

a violation of Article I, § 22 of the Constitution. No claim was made that the valuation date was improper.

**7.** In *Chapin*, the Court stated:
> The filing of the petition is the first actual step toward devoting property to a public use, and in ordinary cases that time is as fair and just to both parties for fixing the value of the property as any that could be adopted. At

any rate, the rule is firmly established; but if it should be applied to a case like this, where the owner has not been brought into court, and no steps have been taken for several years, during which property has greatly advanced in value, it would result in wrong and injustice.

80 N.E. at 1019.

*State v. Griggs,* 89 Ariz. 70, 358 P.2d 174 (1960). *See generally* Annot., 36 A.L.R.3d 751 (1971).

■ In determining whether a valuation date fixed by statute would result in unjust compensation, a court may have to consider numerous factors that influence value. *Uvodich v. Arizona Board of Regents, supra.* Experience teaches, for example, that the announcement of an area-wide redevelopment plan by a government agency, prior to the initiation of any condemnation proceedings, may result in severe depreciation in land values long before the condemnation proceedings commence. Thus, once judicial proceedings are commenced to condemn a limited number of parcels in a large project involving numerous parcels, there may be a substantial adverse impact on the value of the remaining properties not initially included in the project. In *City of Cleveland v. Kacmarik,* 17 Ohio Op.2d 135, 177 N.E.2d 811, 813 (Ct.C.P.1961), the court observed:

> As houses begin to come down, tenants in nearby homes move out, the neighborhood deteriorates or is deserted, vandalism often sets in, appearances and values depreciate with the result that frequently the property owner is greatly handicapped in presenting his case to the jury by the time his land gets into court.

■ The important and fundamental right protected by Article I, § 22 of the Utah Constitution cannot be made subject to undue protraction or manipulation of the condemnation process or to the effect of legal rules or procedures that take no account at all of the numerous factual variables that affect fair values. A failure to take into account a loss of value caused by the condemnation process itself in determining just compensation would result in an expropriation of the value of private property.

■ To avoid such results, courts have set valuation dates prior to the service of summons when the value of condemned property, not initially included in the area to be condemned, has been diminished by the condemnation of nearby properties pursuant to the planned condemnation of a large area. *Klopping v. City of Whittier,* 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345 (1972); 1 L. Orgel, *Valuation Under the Law of Eminent Domain,* § 105 at 447 (2d ed. 1953). *Cf. United States v. Virginia Electric and Power Co.,* 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961). *See generally* Note, *The Condemnor's Liability for Damages Arising Through Instituting, Litigating, or Abandoning Eminent Domain Proceedings,* 1967 Utah L.Rev. 548. By the same token, a valuation date later than that established by statute may be required when a delay in the condemnation proceedings results from causes for which the condemnee is not responsible and the delay would result in a nonrecognition of value in the award of compensation.[8]

■ Therefore, if § 78–34–11 requires the valuation of the Fribergs' property as of the date of service of summons irrespective of all circumstances that affect value and even though the value of their property had substantially appreciated by the time the State established its right to condemn, § 78–34–11 would be unconstitutional as applied under Article I, § 22. *See Klopping v. City of Whittier,* 8 Cal.3d 39, 104 Cal.Rptr. 1, 500 P.2d 1345 (1972); *Board of County Commissioners of Garfield County v. Delaney,* 41 Colo.App. 548, 592 P.2d 1338 (1978); *Orono-Veazie Water District v. Penobscot County Water Co.,* Me., 348 A.2d 249 (1975). *See generally*

8. A publicly announced general plan of area-wide condemnation may have the effect of artificially increasing the value of properties not initially included in the area to be condemned before judicial proceedings have been commenced, thereby resulting in a windfall to the landowner. *See United States v. Miller,* 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1942). Although the constitutional guarantee of just compensation protects private property owners and not the State, our interpretation of § 78–34–11, discussed *infra,* allows an appropriate adjustment in the date of valuation to be made to protect the State against having to pay an award of compensation unfair to it.

*State v. Hollis*, 93 Ariz. 200, 379 P.2d 750 (1963).

However, the language of § 78–34–11 admits of a more flexible construction than that placed on it by the State. The statutory term "deemed to have accrued" does not mandate that the date of service of summons be the date for valuation in all cases and without regard to the facts of the particular case.

 In the first place, a fundamental principle of statutory construction is that a statute should be construed as a whole, and its terms should be construed to be harmonious with each other and the overall objective of the statute. *Cannon v. McDonald*, Utah, 615 P.2d 1268 (1980); *Crist v. Bishop*, Utah, 520 P.2d 196 (1974). Moreover, we are constrained to construe statutory terms to avoid an unconstitutional application of the statute. *State v. Wood*, Utah, 648 P.2d 71 (1982); *In re Boyer*, Utah, 636 P.2d 1085 (1981).

The Legislature's use of nonmandatory language indicates a policy of flexibility. That conclusion is emphasized by the provision of § 78–34–11 that no improvements placed upon the property subsequent to service of process shall be included in the assessment of compensation and damages. That provision would be redundant if the prior sentence flatly required assessment of compensation and damages in all cases as of the date of service of summons.

Furthermore, the statutory phrase "deem to have accrued" imports a degree of flexibility into the valuation scheme of § 78–34–11. The policy of flexibility is demonstrated particularly by the word "deem." The meaning of the term must of course arise from its statutory context, *see* 11A Words & Phrases 181–87 (1971), as well as its constitutional environment, especially when the validity of a statute and its application are so closely dependent upon conformity to strict constitutional requirements.

In a somewhat different context, we have held that the term "deem" is to be construed in light of the purpose to be accomplished by the statute. In *Brimm v. Cache Valley Banking Co.*, 2 Utah 2d 93, 269 P.2d 859 (1954), the Court stated that the term "deem" may be construed to establish either a conclusive or a rebuttable presumption, depending on the context in which it is used. Under the statutory scheme then under consideration, the Court held that the term "shall be deemed" should be construed to impose a rebuttable presumption.

 The varying factors that may affect the determination of just compensation, the necessity of a practicable and reasonably predictable rule of procedure, and the language of § 78–34–11 lead us to conclude that the term "deem" as used in § 78–34–11 creates a rebuttable presumption that the date for determining valuation shall be the date of service of process.

To rebut that presumption, the unfairness of valuing property as of that date must be evident and the difference in value must not be insignificant. In the vast majority of cases, the date of service of summons will be the appropriate date for determining valuation, and no judicial time need be expended in determining whether another date would be more advantageous to one party or the other to some small degree.

We do not mean to imply that "slight" violations of constitutional rights should be overlooked. The perimeters of a constitutional right are not to be slowly constricted by a series of slight, but ever encroaching, violations. However, the right to just compensation is unlike any other constitutional right; it depends on a fair and reasonable estimate of money value. By necessity, such a valuation does not turn on physically ascertainable facts or even on a more or less precise formula for defining value, but rather on variable and imprecise judgments made by reasonable persons who generally, if not always, come to different conclusions.

Neither the constitutional right of the landowner or the right of the State to fairness would find root in firmer ground if the statutory language were construed so loosely as to permit the service of sum-

mons date to be regularly challenged on the basis of appraisals that, at most, might result in minor differences in the valuation. On the contrary, the constitutional right and the interests it protects, both directly and indirectly, are accorded greater protection by a substantial degree of certainty, which will reduce the cost of litigation and promote the expeditious disposition of condemnation suits, thereby allowing the condemnee to adjust with as little disruption as possible to the impact of the condemnation.

■ Since in any given case the number and type of factors that affect value and the weight to be accorded each factor will vary, it is not possible to formulate a precise guideline for when a court should adhere to the service of summons date and when it should depart from it; the nature of the problem simply does not permit greater precision. Suffice it to state that valuation as of the service of summons date will be the rule, and departure from that rule will be the exception.

■ Finally, it should be noted that the presumption established by § 78–34–11 may be rebutted either by the State or by a property owner by a showing that a valuation as of the date of service of summons would result in an award that would not provide "just compensation" to a landowner or be fair to the State. It follows that the burden to rebut the presumption established by § 78–34–1 is on the party which asserts that valuation as of the date of service of summons would be unfair.[9]

### III. DELAY IN PROCEEDINGS

The State contends that the trial court found that the State had met all the statutory and constitutional requirements necessary for the State to establish its right to condemn the property when the trial court entered its order of immediate occupancy

on December 14, 1972. Based on that conclusion, the State asserts that the Fribergs thereafter remained on the property solely by the permission of the State. The State's theory seems to be that entitlement to condemn was established at that time. In addition, the State contends that the delay in this case is attributable solely to the Fribergs' own actions and that they should not be permitted to profit from a delay they themselves caused.

#### A. Order of Immediate Occupancy

■ We turn first to the issue of the legal effect of the order of immediate occupancy. In a condemnation proceeding, the State has the burden of coming forward with the evidence of, and the burden of persuasion to establish, its right to condemn. The State must prove that the taking of the property is necessary and that the property will be dedicated to a public use. *Tanner v. Provo Bench Canal & Irrigation Co.*, 40 Utah 105, 118, 121 P. 584, 589 (1911), *aff'd*, 239 U.S. 323, 36 S.Ct. 101, 60 L.Ed. 307 (1915). *See Williams v. Hyrum Gibbons & Sons Co.*, Utah, 602 P.2d 684, 688 (1979); *Monetaire Mining Co. v. Columbus Rexall Consolidated Mines Co.*, 53 Utah 413, 426, 174 P. 172, 177 (1918). *Cf. Salt Lake County v. Ramoselli*, Utah, 567 P.2d 182, 184 (1977). Only after the State has established the elements of the cause of action, must the property owner prove the amount of compensation to which he is entitled. *State ex rel. Road Commission v. Taggart*, 19 Utah 2d 247, 430 P.2d 167 (1967); *Utah Road Commission v. Hansen*, 14 Utah 2d 305, 383 P.2d 917 (1963); *Tanner v. Provo Bench Canal & Irrigation Co., supra.*

The State argues that because the Fribergs challenged the State's authority to condemn at the hearing on the motion for immediate occupancy, the doctrine of res judicata bars the Fribergs from again adjudicating the State's power to condemn. On

---

9. The concurring opinion reads § 78–34–11 to fix the date of valuation at the time of service of summons only when the right to condemn is actually adjudicated, irrespective of whether valuation is also adjudicated. That construction strains the plain meaning of § 78–34–11 and

would lead to the anomalous situation of requiring different valuation dates depending on the extraneous factor of whether the right to condemn is contested. Neither the Fribergs nor the State has asserted that position.

that premise, the State concludes that its right to condemn was fixed when the order of immediate occupancy was entered and that valuation as of the date of service of process was fair and reasonable because there had been no undue delay between the time of service and the time the order of immediate occupancy was entered. The argument is based on language in *Utah Copper Co. v. Montana-Bingham Consolidated Mining Co.*, 69 Utah 423, 437, 255 P. 672, 677 (1926):

> Under [the predecessor to § 78–34–9] it is apparent that the power of the court to grant or refuse an application to occupy premises sought to be condemned, "pending the action," is, to a large extent, discretionary, depending upon the showing of necessity for a speedy occupation. To wisely exercise the discretion the court might well require the plaintiff to make a showing, not only as to the necessity for a speedy occupation, *but also a prima facie showing as to his right to condemn, if that right be controverted.* [Emphasis added.]

■ The State misconstrues both the language of *Utah Copper* and the nature of a proceeding for immediate occupancy. The above-quoted language only states that if the condemnor's authority to condemn is challenged, a prima facie showing of the right to condemn must be made to support an order of immediate occupancy. However, a prima facie showing of authority is not a final determination of authority. Such a showing simply requires the State to adduce some evidence to prove that it has fulfilled the necessary preconditions to the exercise of the power of eminent domain, a procedure similar to the entry of a preliminary injunction. The law could hardly allow the State to expel a landowner from his land before a final judgment is entered without at least some proof of its power to do so.

■ An order of immediate occupancy is entered *pendente lite* and only authorizes the State to take immediate possession until a final adjudication of the merits. "[A]n order of immediate occupancy is nothing more than an interlocutory order." *State ex rel. Road Commission v. Danielson*, 122 Utah 220, 222, 247 P.2d 900, 901 (1952); *Utah Copper Co. v. Montana-Bingham Consolidated Mining Co.*, 69 Utah 423, 436, 255 P. 672, 676 (1926). *See also* § 78–34–9 (which assumes that an order of immediate occupancy is an interlocutory order only).

■ In the instant case, the order of immediate occupancy, on its face, did not decide the jurisdictional conditions precedent to a final judgment and decree. The order states: "It is further ordered and adjudged that *pending further hearing and trial on the issues that may be presented in this action,* and subject to the conditions herein set forth" the Fribergs may not interfere with the State's possession of the premises (emphasis added). The trial court made no findings as to the State's authority to condemn. The order clearly contemplated that the issues relating to the State's authority to condemn were to be decided in a "further hearing."

The State's right to condemn, if challenged, can finally be determined only after a trial on the merits, not at a hearing on the motion for immediate occupancy. *State v. Denver & Rio Grande Railroad Co.*, 8 Utah 2d 236, 238, 332 P.2d 926, 927 (1958).[10] Since an order of immediate occupancy only requires prima facie proof of the right to condemn, that order is not a final adjudication on the merits. Res judicata has no application in the absence of a final adjudication. *Cf. Pegues v. Morehouse Parrish School Board*, 706 F.2d 735 (5th Cir.1983); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu*, 637 F.2d 391 (5th Cir.1981). *See generally* 1B J. Moore,

10. A defendant may be barred from litigating the merits of the State's authority after an order of immediate occupancy has been granted if he waives his right to litigate those issues or he withdraws the money deposited by the State in obtaining the order. § 78–34–9. Otherwise, the condemnor's power to condemn may be litigated in a plenary trial on the merits.

J. Lucas, & T. Currier, *Moore's Federal Practice* § 0.409[1] (2d ed. 1983).

■■■ The Fribergs' express reservation of their right to contest the power to condemn in plenary proceedings is not prohibited by the rules of res judicata. In fact, as late as December 12, 1979, the Fribergs and the State stipulated that the Fribergs would convey title and that only two issues would be reserved for an evidentiary trial: the amount of damages and the date of valuation.

### B. The Delay in Consummation of Proceeding

The trial court found, and the State asserts on this appeal, that the sole blame for the delay in the consummation of the condemnation proceedings rests on the Fribergs because they filed the first federal court action against the State, which resulted in an injunction against the State's proceeding with the I–215 project, and because they financially supported the second federal action challenging the sufficiency of the E.I.S., which also resulted in an injunction. The State also contends that when undue delay occurs in a condemnation proceeding the only remedy is dismissal of the action. Notwithstanding that position, the State has successfully opposed two motions to dismiss the action for the State's failure to prosecute the case to a conclusion.

The Fribergs, on the other hand, contend that the dominant reason for the long delay between the service of summons and the final acquisition of title by the State some seven and one-half years later was the State's failure to prosecute. Indeed, even apart from the lengthy delays occasioned by the two federal actions, the Fribergs assert, and there is some record evidence to support the assertion, that the State had not even settled on a final alignment of the highway until some time in 1979 or 1980.

Interstate 215 is a partially federally-funded project, and the State had to comply with the National Environmental Policy Act (NEPA). One requirement of that Act is the preparation and filing of a study on the impact of a federally funded project on the environment. Although the State now suggests that it was not subject to NEPA, it nonetheless stipulated in the first federal court action that it was and would file an Environmental Impact Statement. The injunction issued in that case and in the subsequent case, which was filed to test the adequacy of the State's E.I.S., had the effect of placing the whole project in limbo, including the legal proceedings against the Fribergs.

■■■ Preliminarily, we note that fault is not really the issue here. The law does not require landowners to meekly yield to the State's claim to condemn his or her land. Every landowner in this country has a right to resist with every legal means available the expropriation of his or her land. The right of eminent domain does not require docile passivity on the part of a landowner. Nor did the Fribergs engage in tactics that unjustifiably protracted this litigation by demands for a series of continuances. All they did was pursue an established, well-recognized and well-founded legal remedy to compel the State to comply with federal law. The Fribergs' neighbors then challenged the validity of the E.I.S. and the State's compliance with NEPA. Although the State may have had a good-faith belief that it did not have to comply with NEPA, it nevertheless was stopped dead in its tracks by federal court injunctions because it failed to comply with that law. That failure existed even before the State commenced action against the Fribergs.

■■■ Since the State has the burden of proving its right to exercise the power to condemn, *Monetaire Mining Co. v. Columbus Rexall Consolidated Mines Co.*, 53 Utah 413, 174 P. 172 (1918); *Tanner v. Provo Bench Canal & Irrigation Co.*, 40 Utah 105, 121 P. 584 (1911), the State must be prepared to establish that it has complied with all necessary conditions precedent. The delay occasioned by the federal actions cannot justify penalizing the Fribergs by denying them a part of the value of their property, which appreciated while

those actions were pending. It was the State that had an affirmative obligation to comply with NEPA,[11] and it was basically the federal court proceedings that delayed the condemnation action.

 The contention that the Fribergs should lose the appreciated value of their property because of their participation in the federal action simply does not wash. The State, as a matter of constitutional law, cannot penalize the Fribergs' assertion of a federal right by requiring it to give up a state constitutional right. *Cf. Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); *Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); *Terral v. Burke Construction Co.,* 257 U.S. 529, 42 S.Ct. 188, 66 L.Ed. 352 (1922); *Southern Pacific Co. v. Denton,* 146 U.S. 202, 13 S.Ct. 44, 36 L.Ed. 942 (1892); *Barron v. Burnside,* 121 U.S. 186, 7 S.Ct. 931, 30 L.Ed. 915 (1887); *Doyle v. Continental Insurance Co.,* 94 U.S. (4 Otto) 535, 24 L.Ed. 148 (1876); *Insurance Co. v. Morse,* 87 U.S. (20 Wall.) 445, 22 L.Ed. 365 (1874). In sum, it would be a violation of the supremacy clause of the United States Constitution to penalize a landowner's right to "just compensation" because of the assertion of a federal right, and it would be wholly unreasonable and invidious to penalize the assertion of a state right because somebody else asserted a federal right, as would be the case if the Fribergs were penalized because of the second federal lawsuit.

In short, the Fribergs' right to just compensation cannot be defeated because they wanted to retain their land as long as possible. There was, after all, the possibility that the alignment, which apparently was not finally established until years after the filing of the lawsuit, might have been changed, thereby avoiding the necessity of taking the Fribergs' land. Under those circumstances, especially when combined with the State's failure to comply with federal law, the Fribergs had a reasonable expectation that the condemnation of their land might ultimately prove unnecessary.

## IV. VALUATION DATE

 The instant case clearly calls for a departure from valuing the Fribergs' property as of the date of service of process. The period from the service of summons to the establishment of the right to condemn has been far greater than would normally be required to prosecute a condemnation case to a conclusion. There has been a substantial increase in the value of the Fribergs' land during the lengthy period that the proceedings have been pending. Although the record does not disclose how much appreciation has occurred, we take judicial notice of the fact that land values in the Salt Lake Valley have increased substantially during the period in question because of general inflation in the economy and a great increase in the population, accompanied by an increase in demand for land in Salt Lake County. Those factors require the conclusion that the difference in the valuation of defendants' property between the date of service of summons and the date when the right to condemn was settled is evident and significant. Furthermore, interest should be allowed on the award from the date of the Fribergs' abandonment of the property. *City of South Ogden v. Fujiki,* Utah, 621 P.2d 1254 (1980).

Reversed and remanded. Costs to appellants.

DURHAM, J., concurs.

OAKS, Justice, (concurring):

I concur in the reversal and remand and in Parts I and III of the Court's opinion, except for the references to constitutional

---

**11.** Although the State contends that it did not have to comply with NEPA, we do not need to address that issue. The State apparently did not really litigate that issue in the federal district court. Since the parties in those actions treated NEPA as being applicable and injunctions were issued, that is a sufficient basis for determining that the delay caused by the litigation was not the Fribergs' fault. *See* footnote 3.

law in the last few paragraphs of Part IIIB.

I join the Court in its conclusion and reasoning that in the circumstances of this case neither the 1972 stipulation (quoted in the dissent) nor the 1972 order of immediate occupancy deprived the Fribergs of their right to litigate whether the State had established the "conditions precedent to taking" specified in § 78–34–4. The Fribergs did not "abandon" their right to litigate this question because they did not withdraw the $80,000 that had been deposited pursuant to the order of immediate occupancy. U.C.A., 1953, § 78–34–9. While I share the dissent's view that the best interests of all concerned dictate that the State's right to take by eminent domain be resolved as soon as possible, property owners who do not abandon their defenses in the manner specified in § 78–34–9 must have an opportunity to litigate them. Either party can bring that issue on for decision, with or without a simultaneous determination of damages. Because that was not done in this case, the effect was to postpone the date for the determination of value, as explained below.

On remand, the court should award Fribergs compensation and damages on the basis of the value of their property on the date on which the State's right to condemn was finally established by court order on stipulation of the parties, December 12, 1979. This result follows from the fact that the State's right to condemn the Friberg property and the amount of compensation and damages that had to be paid for it were never adjudicated in a contested proceeding. Section 78–34–11, which establishes the measure of compensation and damages as the "actual value" at the "date of the service of summons," only applies, by its terms, to "all cases where such damages are allowed, as provided in the next preceding section [78–34–10]." In the context of § 78–34–11 and its cross-reference to § 78–34–10, the quoted reference to allowance of "damages" seems to me to include both compensation and damages. Both subjects are treated in § 78–34–10,

and both are referenced in the preamble to § 78–34–11.

Since the Fribergs' compensation was not "allowed" pursuant to the contested proceeding contemplated in § 78–34–10 (after *adjudication* of the right to condemn), the valuation date specified in § 78–34–11 is inapplicable to them. In this circumstance, the property owners are entitled to a determination of value as of the date of taking and to interest on the unpaid balance of that amount from that date or from the date they relinquished possession, whichever is later.

In this view of the case, the constitutional discussion in Part II of the plurality opinion is unnecessary. In my view, it also raises troublesome questions that should not be raised and need not be answered.

The summons date that § 78–34–11 specifies for valuation in adjudicated cases is a certain answer to a vital question. That certainty yields to confusion under Part II of the plurality opinion, which turns the statutory valuation date into a "rebuttable presumption" that "imports a degree of flexibility into the statutory valuation scheme." Under that reasoning, the service-of-summons date could not constitutionally be applied to measure compensation or damages where the condemnation proceeding was "prolonged" (elsewhere referred to as a "substantial interval" or "extraordinary delay") and where the value of the property had "substantially appreciated" during the interval before the right to condemn was established "so that the valuation does not reflect a fair valuation of the property and does not therefore constitute 'just compensation.'" The complexities of administering a constitutional doctrine based on such generalities are evident. How much appreciation is "substantial"? How much delay in adjudication is "extraordinary"? When does a proceeding become "prolonged"? And if these conditions are satisfied, how much "flexibility" in a valuation date does the Constitution require?

We should not impose the necessity of answering these questions in adjudicated

cases. If there is a point at which state delay in prosecuting a condemnation action would cause the summons date to be unconstitutional as applied in a rapidly rising market, that issue can be settled in a future case which presents it unavoidably. The recent amendment of § 78–34–4(3) (requiring state use to commence within a reasonable time after the initiation of condemnation proceedings) makes it less likely that this issue will arise. In any event, it need not be resolved on the facts of this case.

HALL, Chief Justice, dissenting:

The dispositional issue presented by this appeal is simply one of fact, namely: whether the plaintiff unreasonably delayed the condemnation proceedings so as to prejudice the Fribergs' right to appropriate compensation and damages. The trial court resolved this issue in favor of plaintiff, and its decision is supported by substantial evidence that precludes this Court from substituting its judgment for that of the trial court.[1]

The record plainly shows that plaintiff postponed final condemnation of the Fribergs' property until 1979 as an accommodation to the Fribergs, who, according to their counsel, "didn't want to surrender the property under any circumstances" and wished to "stay as long as they could [in the hope that] perhaps the highway would never be built."

Following the Fribergs' 1972 stipulation to "immediate occupancy" by plaintiff, the Fribergs made several requests to Donald Coleman, counsel for plaintiff, for cooperation by plaintiff in allowing them to remain on the property as long as possible. A letter written to Coleman on September 12, 1973, by counsel for the Fribergs contained one such request:

In all events, the Fribergs wish to retain the use and occupancy of the property for as long as possible and to that end, I will look to hearing from you....

According to an affidavit by Coleman, he telephoned the Fribergs' counsel following receipt of the above letter and agreed that "as an accommodation to him [Coleman] would delay proceeding to displace the defendants as long as he could." Coleman's affidavit further states:

During the pendency of this action, there have been several verbal communications between Affiant and counsel for the defendants, and the request to delay proceeding against the defendants has been repeatedly made by defendants' attorney and Affiant has agreed to cooperate to the extent possible to avoid displacement of the defendants as long as possible.

Affiant within the last month has received a verbal request from defendants' counsel to delay proceedings to displace said defendants until next year. Affiant said while he could make no promises he would see what could be done.

. . . .

Considerable action has been undertaken in this case since December, 1972, and the telephone conferences that have taken place during the pendency of this cause involved the discussion of issues important to this case, such as deferring displacement of defendants ....

The plaintiff has been ready, willing and able to proceed with this cause of action and would have done so had it not been for the conduct of the defendants and their counsel.

The Fribergs do not deny having made such requests to plaintiff.

In addition to persuading plaintiff to postpone condemnation proceedings, the Fribergs themselves initiated federal litigation that prevented plaintiff from continuing with its plans for the beltway. In *Cottonwood Citizens Group v. Brinegar,*[2] a suit brought by the Fribergs and other Cottonwood-area citizens, the citizens' group alleged violations by plaintiff of federal environmental protection laws and prayed for an order "enjoining defendants

---

1. *Kinkella v. Baugh,* Utah, 660 P.2d 233 (1983).

2. No. C–225–73 (D.Utah Jan. 11, 1974).

from taking any action in connection with the Project including ... authorizing or permitting further or continued condemnation" until the alleged violations had been corrected. In response, the federal district court in which that suit was pending issued an order requiring preparation of an environmental impact statement on the project and suspending all related planning and engineering work by plaintiff except as necessitated by preparation of the impact statement itself. The order also prohibited construction work on the southeast quadrant and limited plaintiff's right to purchase property. This order effectively prevented plaintiff from proceeding with its plans for the beltway between January, 1974, the date of its issuance, and April, 1978, the date of final approval of the impact statement.

In February, 1979, following final approval of the impact statement, Cottonwood, Inc., a group to which the Fribergs had contributed financially, filed a second federal suit challenging the adequacy of the impact statement.[3] Without waiting for resolution of the further issues raised by this second suit, plaintiff served the Fribergs with a notice to vacate in June, 1979. The Fribergs continued to resist relinquishing their property, asserting in an "Objection to [Notice to] Vacate Premises":

> Until [the Cottonwood, Inc.,] case has been resolved and until it is patently clear that the said highway project will proceed on a defined schedule in the immediate future, the property of these Defendants should not be taken or condemned.

Less than three months later, the Fribergs filed a motion to dismiss the condemnation complaint for failure to prosecute, relying on grounds similar to those argued in support of the present motion. In denying that motion, the trial court found as follows:

> Although this action has been pending some seven years, *a good portion of the delay can be placed upon the direct or indirect conduct of the defendants.*

They have either directly or indirectly filed one or two actions in federal court seeking the delay or cancellation of this project. *To now seek dismissal of this case for nonprosecution would be inequitable.* [Emphasis added.]

It is clear that the Fribergs made every effort to procrastinate the date of condemnation as long as possible and that they would not have welcomed an earlier condemnation date even though this might have enabled them to acquire other property at a time when prices were lower. Counsel for the Fribergs stated in this regard:

> [T]he Fribergs didn't want to surrender the property under any circumstances.... [M]oney wasn't the question. At this point the question was could they stay on the property.

It is true that the Fribergs should not be penalized for having exercised their right to litigate issues relating to the legality of the beltway project and to plaintiff's right to condemn. However, the Fribergs' right to exercise all legal means of prolonging the condemnation process did not include the right to profit from the resulting delay by claiming for themselves, in contravention of their stipulation and the well-established statutory valuation date, appreciation on the subject property caused by such delay. Valuation of the Fribergs' property as of the date of summons would not penalize them, nor would it deprive them of any benefit that they would have obtained if they had not exercised this right.

Moreover, the stipulation executed by the parties in 1972 that authorized the court to enter its order of immediate occupancy sets forth terms of compensation that are wholly inconsistent with a 1979 valuation date. The stipulation reads *in toto* as follows:

> 1. Plaintiff shall deposit with the Clerk of the Court the sum of $80,000, which shall be paid by the Clerk to the defendants forthwith by delivering to counsel of record for defendants the

3. *Cottonwood, Inc. v. Hurley,* No. C–79–0081 (D.Utah Nov. 29, 1979).

check or warrant of plaintiff in the sum of $80,000.

2. Defendants shall be entitled to remain in possession of the premises rent free until September 1, 1973 and for periods thereafter on a month by month basis. Defendants shall be entitled to 30 day advance notice before being required to vacate the premises.

3. Interest on any amount recovered by defendants in addition to the $80,000 above mentioned will not begin to accrue until defendants have vacated the premises. Interest from said point in time shall be at the rate provided by Section 78–34–9 Utah Code Annotated as amended.

The foregoing stipulation afforded the Fribergs two substantial monetary advantages, one of which is required by statute,[4] but the second of which is neither contemplated nor required by statute.[5] First, their agreement that the sum of $80,000 be paid *forthwith* placed the Fribergs in a position to immediately invest those funds as they saw fit. The fact that they subsequently chose not to accept the funds and thus voluntarily deprived themselves of that advantage is of no consequence in the resolution of this appeal. Second, the stipulation permitted the Fribergs to remain in possession of the property rent-free. They have since enjoyed some eight years of rent-free occupancy, which adequately compensates them according to their stipulated bargain with plaintiff. As a rule of thumb, monthly rental value is deemed to be a sum equal to one percent of market value. Even assuming that the $80,000 figure paid over by plaintiff represented full market value rather than only 75 percent thereof, as required by statute, *infra*, the monthly rental value was $800, or $9,600 per annum, and the Fribergs, over the eight-year period, have had the advantage of rent-free occupancy valued at $76,800. It is there-fore clearly unjust to allow the Fribergs, by setting their own valuation date, to receive appreciation in addition to the substantial benefits already received under their agreement.

U.C.A., 1953, § 78–34–4 provides that before property can be taken it must appear that the use to which it is to be applied is a use authorized by law and that the taking is necessary to such use. Section 78–34–9 empowers the court to grant immediate occupancy of the premises pending final determination of the condemnation proceeding. The power is largely discretionary, and in the exercise of its discretion, the court may well require a showing that the proposed use is authorized by law and that the taking is necessary for the contemplated use if those issues are in dispute.[6]

The court is obliged to take proof of the value of the premises sought to be condemned, the damages that will accrue from the condemnation and the reasons for requiring speedy occupation and shall grant or refuse immediate occupation according to the equity of the case and the relative damages that may accrue to the parties.[7]

As a condition precedent to occupancy, the condemnor must deposit with the clerk of the court a sum equal to at least 75 percent of the condemnor's appraised value of the property, and payment thereof to the condemnee shall be held to be an abandonment of all defenses except the claim for greater compensation.[8] In this case, the Fribergs agreed that payment of $80,000 would be made forthwith.

The tenor and effect of the stipulation of the parties was to relieve the plaintiff of the need to present proof that the conditions precedent to a taking as provided by §§ 78–34–4 and 78–34–9 had been met. This is to be seen in that the plain language of the stipulation reflects the agreement of

---

4. U.C.A., 1953, § 78–34–9.

5. *Id.*

6. *Utah Copper Co. v. Montana-Bingham Consolidated Mining Co.,* 69 Utah 423, 255 P. 672 (1926).

7. U.C.A., 1953, § 78–34–9, *supra.*

8. *Id.*

the parties that plaintiff was entitled to immediate occupancy. Furthermore, the stipulation does not recite the existence of a controversy as to the authority to take or the necessity of the taking, and of course it does not preserve any such issues for a future determination. In the exercise of its discretion, the court accepted the stipulation and entered its order of occupancy without the necessity of a hearing and the taking of evidence, and for all intents and purposes the taking was then complete. All that remained was a determination of damages and the entry of judgment.[9]

The fact that the stipulation preserved only the issue of damages for trial is not surprising. On the contrary, it is wholly consistent with the usual course of events in condemnation proceedings. Whenever issues pertaining to authority to condemn or necessity of the taking exist at the time an order of immediate occupancy is sought, the best interests of all concerned, including those of the court, dictate that those issues be resolved prior to the issuance of the order of occupancy. Otherwise, the condemnor runs the unnecessary risk of defeat and the resultant loss of sums expended in preparing the property for its new use. Similarly, the condemnee runs the risk of irreparable harm to the property if the condemnor is permitted to occupy and alter the property to accommodate the new use.

The particular facts of this case graphically illustrate the foregoing discussion. Plaintiff's designated use of the property entailed the construction of a remaining segment of the belt-route highway system in Salt Lake County. In light of the magnitude of such a project and the drastic change it would make in the topography, it seems beyond comprehension that the parties would agree to an order of immediate occupancy if in fact legitimate issues of authority or necessity of the taking remained to be resolved.

The main opinion concedes that it is impossible to formulate a guideline for when the courts should depart from the statutory date of service of summons for the purpose of assessing compensation and damages.[10] Therein lies the fallacy in considering a departure therefrom at all. To do so invites controversy in every case and affords a means for the parties to manipulate the measure of compensation that has heretofore been prevented by adherence to the statutory provision.

I remain unpersuaded that the facts of this case should prompt this Court to depart from the explicit language of U.C.A., 1953, § 78–34–11, which establishes the valuation date as of the date of service of summons.

I would affirm the judgment of the trial court.

HOWE, J., concurs in the dissenting opinion of HALL, C.J.

---

9. As provided by U.C.A., 1953, § 78–34–15.

10. Provided for by U.C.A., 1953, § 78–34–11.