REDEVELOPMENT AGENCY OF
SALT LAKE CITY, Plaintiff and
Respondent,

v.

Earl D. TANNER and Mary Louise Tanner, his wife, David V. Trask, Grant S. Kesler, and Larry V. Lunt, Defendants, Cross-Plaintiffs and Appellants,

v.

STANDARD LIFE INSURANCE COMPANY, a corporation, Defendant and Cross-Defendant.

REDEVELOPMENT AGENCY OF
SALT LAKE CITY, Plaintiff and
Respondent,

v.

Earl D. TANNER and Mary Louise Tanner, his wife; David V. Trask; Grant S. Kesler; and Larry V. Lunt, Defendants and Appellants.

REDEVELOPMENT AGENCY OF
SALT LAKE CITY, Plaintiff and
Respondent,

v.

TRASK & BRITT, a professional corporation; Grant S. Kesler; Larry V. Lunt; and Capitol Life Insurance Co., a corporation, Defendants and Appellants.

Nos. 17692, 19348 and 19684.

Supreme Court of Utah.

June 19, 1987.

Rehearing Denied Aug. 17, 1987.

Harold A. Hintze, Provo, and William D. Oswald, Salt Lake City, for Redevelopment Agency.

Robert S. Campbell and E. Barney Gesas, Salt Lake City, for defendants Tanner, Trask, Kesler, and Lunt.

Craig S. Cook, Salt Lake City, for Trask & Britt.

HALL, Chief Justice:

These cases, consolidated for purposes of appeal, emanate from action of the Redevelopment Agency of Salt Lake City (the RDA) to acquire appellants' properties. The Tanner group in case No. 19348 and the Trask group in case No. 19684 appeal separate trial court determinations that the RDA did not misrepresent or mislead appellants into waiving claims and abandoning litigation challenging the RDA's jurisdiction to condemn their properties. Case No. 17692 involves a condemnation compensation trial and raises claims of jury misconduct and trial court error in denying appel-

lants' request to call the RDA's consultant to testify as an "expert witness." For reasons enumerated below, we affirm the trial court's determination in each of the three appeals.

## I

In 1969, the Utah legislature enacted the "Utah Neighborhood Development Act."[1] Under the provisions of this act, municipal redevelopment agencies are created and empowered in part to undertake "redevelopment projects" within areas determined to be "blighted."[2] Acquisition and redevelopment of "blighted" property contributes to the health of the community and may be accomplished by various means, including eminent domain.[3]

Pursuant to this act, Salt Lake City's Board of Commissioners (the Commission) was designated to act as the City's RDA. In June 1977, the Commission enacted an ordinance specifying 18½ blocks of downtown Salt Lake City, Utah, as a "blighted" area. Appellants' real properties are situated on Block 53 (between Third and Fourth South and State Street and Second East) and are included within the project area. In early 1979, the RDA began the statutory process necessary for the acquisition of Block 53. A "redevelopment plan" for Block 53 was finally published and put into effect by the Commission in June 1979.

In July 1979, the Tanner group and the Trask group filed separate actions in Third District Court challenging the authority of the RDA to condemn their properties.

Shortly thereafter, the RDA commissioned a private architectural firm to develop a "master plan" report for Block 53. Apparently, the purpose of this report was to provide recommendations and guidelines to private developers choosing to bid on the acquisition and redevelopment of the block. In October 1979, the RDA met with appellants at the architect's office to review

1. Utah Neighborhood Development Act, 1st Spec. Sess., ch. 5, 1969 Utah Laws 1134 (codified as amended at Utah Code Ann. §§ 11–19–1 to –35 (1986)). While amendments were made to this act in 1983, they do not affect the resolution of these appeals.

2. *Id.*

3. Utah Code Ann. § 11–19–23.9(2) (1986).

drawings and a scale model of the "master plan." Representations made by the RDA at and subsequent to that meeting are at issue herein.

In November 1979, the RDA offered the Trask group $277,400 and the Tanner group $394,000 for their respective properties. Both groups declined, and further negotiation continued for approximately two months. In January 1980, the RDA commenced condemnation proceedings against appellants' properties. Thereafter, the parties entered into stipulations wherein the RDA agreed to deposit with the court 100 percent of a higher estimate of the market value of the properties for appellants' immediate withdrawal and use. In exchange, appellants stipulated to the RDA's immediate possession of the properties and agreed to dismiss their lawsuits and waive all claims and challenges (except the issue of just compensation) to the RDA's authority to condemn. Pursuant to these stipulations, both trial courts entered orders of immediate occupancy for the RDA, and appellants withdrew the monies the RDA deposited with the courts. The parties thereafter proceeded to trial on the issue of "just compensation."

In August 1980, a jury awarded the Tanner group $357,000 as just compensation for their property. This sum was less than the $417,640 appellants originally received and resulted in a $60,640 refund to the RDA. Subsequently, the Trask group stipulated that the $294,044 offered by the RDA was in fact just compensation for their property.

Thereafter, the Tanner group filed appeal No. 17692, claiming jury misconduct and error by the court in refusing appellants' request to call the RDA's consultant to testify as an expert witness. While that appeal was pending, both the Trask group and the Tanner group alleged that the RDA misrepresented and abandoned its original plans for the use of their properties. Accordingly, appellants filed several motions below, including motions to vacate

the orders of immediate occupancy and to dismiss the condemnation proceedings. Therein, appellants sought to withdraw their stipulations to the RDA's occupancy and right to condemn their properties.

Upon motions to this Court, we stayed the parties' pending appeals and remanded the cases to the trial courts for evidentiary proceedings on the issues of misrepresentation and mistake. We also issued an order of mandamus in *Tanner v. District Judges of Third Judicial District Court.*[4] Thereafter, both trial courts conducted evidentiary hearings and subsequently denied appellants' requests for relief, thereby sustaining the condemnation awards and the binding effect of the stipulations. Appeals in cases No. 19348 and No. 19684 followed.[5]

## II

### Cases No. 19348 and No. 19684

Both the Tanner group and the Trask group argue on appeal that since the RDA failed to follow statutory prerequisites to condemning their properties, the trial courts had no jurisdiction over the subject matter of the lawsuits and dismissal of the condemnation actions was required. However, as discussed below, the dispositive issue presented by these appeals is whether appellants were induced by mistake or misrepresentation into signing stipulations waiving all claims and defenses to the RDA's authority. The conclusions of the trial courts in favor of the RDA are not clearly erroneous and preclude this Court from substituting its judgment for that of the trial courts.

Each "Order of Immediate Occupancy" based upon the parties' stipulations provided in pertinent part:

[T]he Court having carefully examined the pleadings and the written Stipulation pertaining thereto referred to above, and, having determined that plaintiff has

---

4. 649 P.2d 5 (Utah 1982).

5. Due to their similarity, we deal with the issues raised in cases No. 19348 and No. 19684 simultaneously.

the right of eminent domain [6] and that the purpose for which the property of defendants sought by plaintiff herein to be condemned is for a public purpose [7] and that the property is located within a redevelopment project area which is blighted, and that the project area is detrimental or inimical to the public health, safety or welfare, and that the immediate occupancy thereof is necessary and proper; and, the *parties having expressly reserved* for future adjudication *only the issue of the amount of just compensation to be paid Defendants, in accordance with the provisions of Section 78–34–9,* Utah Code Annotated, 1953, as amended:

NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED:

1. Subject to and in accordance with the "Stipulation for Order of Immediate Occupancy," a copy of which is attached hereto and by reference made a part hereof, Plaintiff be and is hereby authorized to occupy the property belonging to Defendants above-named described in the Complaint on file herein ... [descriptions of particular property] which said properties are sought for uses by the public in connection with and as part of the C.B.D. Neighborhood Development Project authorized and approved by the Salt Lake City Commission on June 21, 1979.

2. Plaintiff is hereby permitted to take immediate possession of said properties and continue in possession of the same pending further hearing and trial on the issue of just compensation which is the only issue which may be raised in this action....

3. Plaintiff has tendered into court and deposits with the Clerk of the Court herewith for the benefit of Defendants the sum of [$294,044 for the Trask group and $417,640 for the Tanner group] being 100% of the amount of just compensation based upon two independent appraisals which Plaintiff has caused to be made of the premises, adjusted to the date of taking.

....

5. Defendants may withdraw the [total sums indicated above] deposited with the Clerk of the Court for the use and benefit of Defendants without prejudice to any claim they may wish to assert for additional just compensation in the trial of the matter....

(Emphasis added.) Pursuant to these orders, the RDA deposited with the courts 100 percent of the agreed sums. Appellants subsequently withdrew these monies pursuant to Utah Code Ann. § 78–34–9 (1977), which provides in pertinent part:

Upon the application of the parties in interest, the court shall order that the money deposited in the court be paid forthwith for or on account of the just compensation to be awarded in the proceeding. A payment to a defendant as aforesaid shall be held to be an *abandonment by such defendant of all defenses* excepting his claim for greater compensation.[8]

(Emphasis added.) The explicit effect of the parties' stipulations and withdrawal of funds pursuant to section 78–34–9 was to relieve the RDA of presenting proof that the conditions precedent to condemnation under section 11–19–23.9 had been met. Indeed, the plain language of both stipulations reflects the acknowledgment of all parties that the RDA was *entitled* to immediate occupancy. Because the stipulations do not recite the existence of controversy as to either the RDA's authority to take the properties or the RDA's compliance with statutory prerequisites to condemning

---

6. Under the provisions of the Utah Neighborhood Development Act, the RDA may condemn property through the procedures of eminent domain. Utah Code Ann. § 11–19–23.9 (1986); *see also Redevelopment Agency v. Barrutia,* 526 P.2d 47, 48 (Utah 1974); *Redevelopment Agency v. Mitsui Inv., Inc.,* 522 P.2d 1370, 1371 n. 2 (Utah 1974).

7. Redeveloping areas to terminate urban blight is a public purpose. *See Tribe v. Salt Lake City Corp.,* 540 P.2d 499, 503–04 (Utah 1975); *see also Berman v. Parker,* 348 U.S. 26, 33–34, 75 S.Ct. 98, 102–103, 99 L.Ed. 27 (1954).

8. This Court has heretofore indicated the applicability of section 78–34–9 to redevelopment law. *See, e.g., Mitsui Inv., Inc.,* 522 P.2d at 1372 & n. 3.

the same, appellants did not preserve any such issues for future determination. Consequently, in the appropriate exercise of discretion, the trial courts accepted the stipulations and entered the appropriate orders of occupancy. For all intents and purposes, the taking was then complete.

The fact that the stipulations only preserved the issue of just compensation for trial is not surprising. Whenever issues pertaining to authority or jurisdiction to condemn exist at the time an order of immediate occupancy is sought, the best interests of all concerned, including the court, dictate that those issues be resolved prior to issuance of the order. Otherwise, the condemnor runs the risk of defeat and the resultant loss of funds expended in preparing the property for its new use. Similarly, the condemnee runs the risk of irreparable harm to the property if the condemnor is permitted to occupy and alter the property to accommodate the new use. The specific facts of the instant case illustrate this conclusion. The RDA's planned use for the properties apparently included development and construction of new buildings and plazas. In view of the magnitude of this project and the resultant significant change in the nature of the existing properties, it is incomprehensible that the parties would stipulate and agree to orders of immediate occupancy if legitimate issues of authority and compliance with statutory procedures remained to be resolved.[9]

██ In *Utah State Road Commission v. Friberg*,[10] the parties entered into a stipulation that was incorporated into an order establishing the state's right to condemn and reserving for later determination the amount of compensation to be awarded and the date for assessing valuation.[11] Therein, this Court noted, "A defendant may be barred from litigating the merits of the State's authority after an order of immediate occupancy has been granted if he waives his right to litigate those issues or he withdraws the money deposited by the State in obtaining the order."[12] This language correctly states the established and applicable rule that once a property owner chooses to withdraw the money deposited by the State in obtaining the order, he waives *all* objections and defenses to the action and to the taking of his property, except any claim to greater compensation.[13]

Appellants would have us ignore this rule by recognizing that the "term 'defenses' [in section 78-34-9] cannot include the failure of the lower court[s] to acquire subject matter jurisdiction but rather is limited to personal defenses of the landowner." In other words, appellants contend that even though they waived all claims and defenses regarding the RDA's compliance with statutory procedures and authority to condemn, they can now raise those same claims and defenses to show the trial courts' lack of jurisdiction in these cases. We disagree. Appellants apparently misunderstand both the language of and principles behind section 78-34-9 and the nature and result of their stipulations. The stipulations are proof of the state's power to expel appellants from their properties. By entering into the stipulations and withdrawing the monies, appellants acknowledged that the jurisdictional conditions precedent to the RDA's exercising the power to condemn were properly satisfied. Therefore, the lower courts' jurisdiction in that regard was not at issue.

To adopt appellants' arguments would be to sanction abuse in settlement proceedings by allowing parties (once they determine that additional money is available) to invali-

9. *Utah State Rd. Comm'n v. Friberg*, 687 P.2d 821, 840 (Utah 1984) (Hall, C.J., dissenting).

10. 687 P.2d 821 (Utah 1984) (plurality opinion).

11. *Id.* at 827.

12. *Id.* at 833 n. 10 (citing Utah Code Ann. § 78-34-9).

13. *See* 6 J. Sackman, *Nichols on Eminent Domain*, § 24.11[1][c], at 24–177 (3d ed. 1986) (based upon the Uniform Eminent Domain Code); 6 J. Sackman, *Nichols on Eminent Domain*, § 26.31 (3d ed. 1986); 6A J. Sackman, *Nichols on Eminent Domain*, § 28.321(2) (3d ed. 1985); 1A J. Sackman, *Nichols on Eminent Domain* § 4.6, at 4–37 (3d ed. 1985) (waiver and estoppel); *see also City of Durham v. Bates*, 273 N.C. 336, 160 S.E.2d 60 (1968); *State v. Jackson*, 388 S.W.2d 924 (Tex.1965).

date stipulations by simply claiming that issues they stipulated to can forever be raised.[14] Indeed, departing from the rule in section 78–34–9 invites controversy in every condemnation case and affords a means for parties to manipulate the measure of the compensation, which the statutory provision attempts to prevent.

Therefore, upon accepting the benefits under section 78–34–9, appellants in the instant cases, absent misrepresentation, are precluded from attacking the Utah Neighborhood Development Act, the jurisdiction of the courts to enter the order granting the RDA possession of the properties, and the failure of the RDA to strictly comply with statutory prerequisites to condemnation. Accordingly, we now turn to the issue of misrepresentation and the factual circumstances underlying the stipulations.

### III

Appellants claim that the trial courts erred by denying their motions in these cases. Without marshalling all of the evidence in support of the trial courts' determinations,[15] appellants summarily contend that they were improperly induced to withdraw their challenges to the condemnation proceedings by the RDA's own representations that their properties would be used for a municipal office building and plaza complex. These representations in turn allegedly persuaded appellants that the properties were being condemned for a public use. Therefore, they contend that they were led to believe that since the City could condemn their properties if the RDA failed in its attempt, they had no valid defense to the RDA's condemnation action or possibility of success in their related lawsuits. Consequently, they stipulated to the RDA's authority to condemn. Appellants now claim that the RDA's representations were either false when made or have become false because the RDA has abandoned the

existence of an uncontroverted public use. Accordingly, appellants argue that the stipulations should be dismissed and they should be allowed to challenge the authority of and procedures followed by the RDA.

Also, appellants claim that the trial courts erred by ignoring this Court's mandate in *Tanner* and by not finding clear and convincing evidence of unilateral mistake or material misrepresentation requiring rescission of the stipulations. In short, appellants would have us believe that the lower courts arbitrarily disregarded and failed to fairly examine evidence on remand that plainly showed material misrepresentation and justifiable mistake that culminated in the stipulations to waive jurisdictional defenses. We are not persuaded.

First, the orders and opinion of this Court on remand did not mandate a particular result. Rather, we instructed the trial courts to take additional evidence and give due consideration to that evidence before reaching a conclusion.[16] At the evidentiary hearings, both trial courts heard extensive evidence regarding appellants' contentions. Appellants were given ample opportunity to present their evidence and arguments regarding mistake and misrepresentation. That the trial courts below declined to adopt appellants' contentions does not prove that they failed to give due consideration to appellants' evidence. Upon our review of the records, we conclude that the trial courts did not fail to comply with our orders and previous decision.

█ Second, appellants' claims are predicated on our acceptance of their version of the events which occurred and how the trial courts should have perceived the circumstances as they existed. However, the facts appellants advance in support of their arguments are carefully chosen to the exclusion of other evidence in the records supporting the lower courts' decisions. Due to the trial court's advantaged posi-

---

**14.** In their briefs, appellants express a willingness to return the monies they withdrew if they could be allowed to challenge the jurisdiction and authority of the RDA to condemn their properties. Such willingness is irrelevant here.

**15.** *Ashton v. Ashton,* 733 P.2d 147, 150 (Utah 1987) (citing *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985)).

**16.** *See Tanner,* 649 P.2d at 5–6.

tion, the presumptions favor its judgment.[17] Where there is dispute and disagreement in the evidence, we assume that the trial judge believed those aspects and fairly drew the inferences to be derived therefrom which gave his decision support.[18] To this end, neither trial judge found credible the evidence appellants marshalled. Instead, the courts viewed the evidence as supporting the determination that there were no material misrepresentations or mistakes underlying the stipulations. These conclusions are not clearly erroneous. Accordingly, the decisions of the trial courts are affirmed.

We have also examined appellants' other objections to the trial courts' determinations and find them to be without merit.

IV

*Case No. 17692*

In this case, the Tanner group attacks the Third District Court's denial of their motion for a new trial based upon alleged jury misconduct and failure to allow the RDA's consultant to testify as an expert witness. In April 1981, appellants presented affidavits alleging that several jurors had viewed the subject property during the trial on just compensation. Appellants claim that these unauthorized views were prejudicial grounds for a new trial. In denying appellants' motion for a new trial on the grounds of juror misconduct, the court observed:

> [W]hatever cursory visit was made to the condemned property was at most harmless error, and did not prejudice this jury which took considerable amount of time in reviewing all of the photographs and

testimony of experts before arriving at its verdict.

Upon review of the record, the trial judge's determination is not clearly erroneous.

■ First, a majority of the affidavits offered by appellants should not have been considered. Specifically, appellants provided several affidavits of affiants who "polled" the individual jurors. These affidavits purported to restate what jurors told the affiants after being contacted sometime subsequent to the trial.[19] As early as 1913, courts held that affidavits filed by third persons were not competent to impeach jury verdicts. In *Maryland Casualty Co. v. Seattle Electric Co.*,[20] that court held that "affidavits of third persons as to unsworn statements of jurors tending to show either the fact of misconduct or its effects upon the verdict cannot be received for any purpose because they are of a purely hearsay character."[21] Because appellants' affidavits are primarily of this character, the trial judge could properly refuse to consider them.

Second, appellants offered the affidavit of Don K. Green ("Juror Green") and contended that his view was manifestly prejudicial because of the changed conditions of the condemned property and the surrounding premises. In the past, this Court has ruled that in eminent domain proceedings, the jury is precluded from basing its verdict on self-obtained evidence not presented at trial.[22] However, many courts have held that an unauthorized visit by a juror will be regarded as harmless where the visit did not disclose any evidence not already admitted at trial.[23] Jury misconduct, there-

---

17. *McBride v. McBride,* 581 P.2d 996, 997 (Utah 1978).

18. *See Gillmor v. Gillmor,* 657 P.2d 736, 739 (Utah 1982).

19. Apparently, most jurors refused to sign affidavits admitting any unauthorized view.

20. 75 Wash. 430, 134 P. 1097 (1913).

21. *Id.* at 437, 134 P. at 1099–1100. *See also State v. Marvin,* 124 Ariz. 555, 559, 606 P.2d 406,

410 (1980) (en banc); *Rowley v. Group Health Coop.,* 16 Wash.App. 373, 379, 556 P.2d 250, 254 (1976).

22. *State ex rel. Road Comm'n v. White,* 22 Utah 2d 102, 103, 449 P.2d 114 (1969).

23. *See, e.g., Nelson v. C & C Plywood Corp.,* 154 Mont. 414, 432–33, 465 P.2d 314, 324 (1970); *Winters v. Hassenbusch,* 89 S.W.2d 546, 552–53 (Mo.Ct.App.1936); *Reed v. L. Hammel Dry Goods Co.,* 215 Ala. 494, 497, 111 So. 237, 239–40 (1927).

fore, must be judged on the individual facts and circumstances of the case.[24]

In the instant case, review of Juror Green's affidavit indicates that he experienced no more than a cursory view of the subject premises. Indeed, "[he merely] went inside the building along the hall of the first floor and then went out of the building. He then looked down the alley and looked at the side of the building." In contrast, numerous photographs of both the inside and outside of the building were received into evidence at trial, after the court determined that they adequately depicted the property on the day of its taking.

Appellants, however, cite this Court's decision in *State ex rel. Road Commission v. White* [25] as determinative of this issue. In *White,* individuals had "razed the frame house and extensively had demolished the interiors of the other buildings." [26] Therefore, because of one juror's unauthorized view of the property, "the jury well may have been influenced adversely with respect to an objective valuation of the property as of the time of taking." [27] *White* is distinguishable because that property had been vandalized and burned after the owner had vacated and before the compensation hearing. In contrast, appellants herein were still using the building in question as of the time of this just compensation proceeding.[28] Apparently, then, it had not significantly deteriorated and was not suffering from nonuse. Moreover, appellant Kesler himself testified at trial that the pictures admitted into evidence accurately reflected the property at the time of its taking, as well as at the time of trial. So, contrary to the assertion of appellants, the condition of the property had not changed significantly from the date of its taking until the date of trial.

■ Accordingly, the jury's verdict in this case was fully supported by the evidence, and the observations made by the offending juror did not add to the evidence

properly received and considered by the jury. Therefore, any error was harmless, and this reason for a new trial must fail.

Finally, appellants contend that the trial court erred in not allowing them to call the RDA's consultant to testify as an expert witness regarding the value of the property. By means of a motion in limine, the RDA excluded consultant Raymond Fletcher from giving subpoenaed testimony on the basis of the attorney-client privilege and the work product doctrine. Apparently, Fletcher had not actually appraised appellants' property and did not have an independent opinion as to its value. Rather, he had been retained as a confidential adviser to review the independent appraisals and consult with the RDA in preparation for the condemnation suit.

■ Appellants argue that because Fletcher's opinion as to the value of the property was higher than that of the appraiser who actually testified for the RDA, the value of the property was "low-balled" and appellants had no way to effectively contradict that evidence. In short, appellants claim that Fletcher's testimony could have been used to show that the value of appellants' land was greater than the amount the RDA was offering. The court granted the RDA's motion in limine to exclude Fletcher's testimony, apparently on the grounds that he had not actually appraised the property and was not an expert witness in that sense, but rather had worked as a consultant and confidential advisor to the RDA and its attorney. We pass over the potential attorney-client and work product problems that the RDA contends might have arisen had Fletcher testified, because we are satisfied that even if exclusion of the evidence was erroneous, the judgment still could not be reversed. The exclusion of evidence is harmless unless the excluded evidence would probably have had a substantial influence in bring-

24. *See White,* 22 Utah 2d at 103, 449 P.2d at 115.

25. 22 Utah 2d 102, 449 P.2d 114.

26. 22 Utah 2d at 103, 449 P.2d at 114.

27. *Id.*

28. Respondent notes in its brief that after the order of immediate occupancy was entered, the subject property was leased back to defendants.

ing about a different verdict or finding.[29] Upon viewing the evidence in the light most favorable to the jury verdict,[30] there is no reasonable likelihood that a different result would have followed from permitting the jury to consider the testimony of Fletcher as to the appraised value of the property; at least two other appraisers who actually appraised the property testified as to its value.[31] Nor have appellants shown that other appraisers were unavailable. Indeed, the record indicates that at least one other individual who actually appraised the property was not called by appellants to testify.

Appellants have not shown, and we do not believe, that Fletcher's testimony would have substantially affected the outcome. Therefore, exclusion of his testimony was not prejudicial error.

## V

*Conclusion*

In sum, the determinations of the trial courts are not clearly erroneous, and there is no basis for reversing the judgments. Accordingly, the orders are in all respects affirmed.

STEWART, Associate C.J., HOWE and DURHAM, JJ., and GEORGE E. BALLIF, District Judge, concur.

ZIMMERMAN, J., having disqualified himself, does not participate herein; Ballif, District Judge, sat.

---

**29.** *Hill v. Hartog,* 658 P.2d 1206, 1208 (Utah 1983); *Gillmor,* 657 P.2d at 743.

**30.** *Hill,* 658 P.2d at 1209.

**31.** The fact that appellants' own appraiser testified that the property was worth $850,000 refutes appellants' argument that without Fletcher's testimony, they had no way to contradict the estimate of the RDA's appraiser.