**BRIXEN & CHRISTOPHER, ARCHITECTS, a professional corporation, Plaintiff and Respondent,**

v.

**Roger H. ELTON and John H. Laub, Defendants and Appellants.**

No. 880199–CA.

Court of Appeals of Utah.

July 13, 1989.

Walter P. Faber, Jr. (argued), Salt Lake City, for defendants and appellants.

Hardin A. Whitney (argued), H. Dennis Piercey, Salt Lake City, for plaintiff and respondent.

OPINION

Before BENCH, GARFF and ORME, JJ.

GARFF, Judge:

Plaintiff/respondent Brixen & Christopher, Architects (B & C) sued defendants Roger H. Elton and John H. Laub for payment for architectural services. The trial court entered judgment against Elton and Laub in the amount of $50,000 plus interest and costs. Elton appeals this judgment. We affirm.

B & C met with Elton and Laub in early March of 1982 to discuss a proposed building project, the Wolf Creek Recreation Center, to be located in Eden, Utah. This building was to be one of the amenities for the Wolf Creek Condominiums (Wolf Creek) that Elton and Laub were developing.

B & C's architectural services for this project were to be performed in five phases: (1) programming and schematic design, (2) design development, (3) construction documents, (4) bidding or negotiation, and (5) construction administration. On March 4, 1982, in an initial signed letter agreement, Elton and Laub authorized B & C to proceed immediately with the first phase of the project. The letter agreement indicated that the maximum architectural fee for the first phase was to be $7,500.

Between March 10 and July 28, 1982, James W. Christopher, a B & C principal, met a number of times with Wolf Creek representatives and proposed several preliminary drawings. He met personally with Elton and Laub on July 28 to gain approval of the proposed design so that B & C could proceed with the subsequent phases of the project.

Christopher testified that Elton and Laub approved the first phase at this meeting, subject to "some more refinements in design," and gave him permission to proceed with the other phases of the project. They also discussed B & C's fee schedule for architectural services. Elton and Laub asked Christopher to prepare a letter agreement, including a payment schedule for fees to be paid during the course of the work, starting immediately after July 28. Elton and Laub were anxious to get construction started, so urged Christopher to proceed as quickly as possible on the project. They also requested drawings to use in selling the condominium units. Elton testified, however, that he did not approve phase one at this meeting because the preliminary design was unacceptable and exceeded allowable costs.

On July 29, 1982, B & C issued a statement to Elton and Laub showing that the first phase had been completed, that hourly fees had exceeded the agreed-upon limit of $7,500, and that the $7,500 fee for phase one was due. At this time, Elton and Laub were having difficulty securing financing for the project.

On August 2, 1982, pursuant to the July 28 meeting, Christopher sent a letter to Elton and Laub which confirmed the parties' decision to proceed with the other phases of the architectural work and set forth B & C's fee requirements. In part, this letter stated that, "[a] signed copy of this letter will verify your approval of this Agreement and serve as our notice to proceed with the Design Development Phase." The letter included a form contract which required the owner to approve prior phases of the project before B & C could proceed with subsequent phases.

B & C hired consultants for electrical, mechanical, and structural engineering design, who worked on site. By August 31, 1982, the parties were reviewing requirements for a fall 1982 construction commitment, resulting in more meetings and correspondence between B & C, Elton and Laub, and Wolf Creek representatives. Among other things, B & C assisted Wolf Creek in proceedings before the Weber County Planning Commission, made progress reports to Elton and Laub, and worked closely with Wolf Creek representatives and Great Basin Engineering, which had been hired by Wolf Creek, on master site planning.

On September 23, 1982, Laub prepared a $7,500 check drawn on the account of Wolf Creek Resort for B & C's work on the first phase. This check was never delivered, although Laub assumed that it had been. Christopher was not aware that the check even existed until Laub mentioned it in his deposition.

On September 30, 1982, Christopher sent a letter to Elton and Laub, requesting that they sign the proposed August 2 letter agreement. This letter consisted of an update on the project and a statement for $10,000 in fees, $7,500 of which represented the amount due in the July 29 statement for the first phase, and $2,500 of which represented payment for partial completion of phases two and three.

On October 4, 1982, Christopher delivered a bid package, including drawings and specifications for site work, to Wolf Creek representatives. These documents were distributed to contractors to invite bids. About October 11, 1982, Wolf Creek received bids for the site work, one of which was below the estimated cost.

Neither Elton nor Laub signed the August 2 letter agreement despite periodic requests by Christopher that they do so. Elton testified that on a number of occasions they had told Christopher they would not sign it until the design was acceptable and the costs were reduced. Christopher, however, testified that Elton and Laub had already orally agreed to the terms in the letter in the July meeting, and that he had proceeded as set forth in the letter with Elton's and Laub's full knowledge and approval.

On November 26, 1982, pursuant to a prior telephone conversation between Elton and Christopher, Christopher sent Elton and Laub an amendment to the August 2 letter agreement, which reflected increased architectural fees based upon structural and mechanical design changes. In this letter, Christopher increased the first phase charge by $1,000 to a total of $8,500, and stated, "[i]f you agree with these changes, please sign and return one copy of this document for our files. This document will become our Amendment to the Agreement, when returned, and all provisions of the original Agreement will apply." The letter provided for Elton's and Laub's signatures. Enclosed with the letter was a statement for $27,500, dated November 26, 1982, for completion of phases one and two as revised by the amendment. However, neither Elton nor Laub signed this proposed amendment. In spite of not being paid and Elton's and Laub's failure to sign the proposed letter agreements, B & C continued to perform work on phases two, three, and four of the project.

On January 17, 1983, B & C issued a statement for $57,500, in accordance with the August 2 letter agreement as amended by the November 26 letter agreement. This statement included the previously billed amount of $27,500 for work done on the first two phases and a new charge of $30,000, representing compensation for eighty-five percent completion of the third phase. At this time, B & C had also done some work on the fourth phase, but did not bill Elton and Laub for it. Christopher asked Elton for payment by telephone at this time. Elton said that he was ill, but would try to facilitate payment.

On February 23, 1983, Elton authorized a change to an alternative mechanical system design, after being informed of estimated costs and benefits of the proposed alternative system. Shortly thereafter, B & C stopped architectural work on the project because of non-payment.

On March 2, 1983, Christopher again spoke to Elton by telephone, demanding payment that week. Elton agreed that payment to Christopher was long overdue, and stated that he and Laub were expecting a $500,000 cash investment.

On March 4, 1983, Elton called Christopher and told him that the $500,000 cash was coming soon and that the money would be in the bank by the middle of the following week. He promised that payment would be made immediately, no later than March 14 or 15. Payment was not made as promised.

On April 16, 1983, Christopher visited Elton in Reno. Elton told Christopher that financing was close and that interest would

be paid on the amount outstanding. Elton also told Christopher that he was pleased with B & C's work.

Ultimately, B & C received no payment for the architectural work it performed on the Wolf Creek Recreation Center. B & C brought suit on February 2, 1984, seeking payment. In July 1984, Laub met with B & C personnel and admitted that he owed money to them for architectural work.

After a three-day trial in June 1986, the lower court, sitting without a jury, determined that B & C had provided architectural services as requested by Elton and Laub, and that Elton and Laub were estopped from denying that B & C's services were authorized, thus awarding judgment in B & C's favor against Elton and Laub in the amount of $50,000, plus interest and costs.

Elton and Laub unsuccessfully moved for a new trial. Elton then brought this appeal. Laub's liability on the judgment is stayed because of his bankruptcy.

On appeal, Elton disputes his liability for B & C's fees, especially for those incurred on subsequent phases of the project and for the $1,000 additional charge on the first phase. He alleges that (1) the trial court incorrectly determined that he was estopped from denying B & C's services were authorized, and (2) the trial court improperly interpreted the parties' contract.

The parties signed a letter agreement authorizing B & C to proceed with the first phase of the project for a fee of $7,500. Although there is no written approval signed by Elton or Laub authorizing work on the subsequent phases, the trial court found that: (1) in the July 28, 1982 meeting, Elton and Laub had authorized B & C to proceed with the subsequent phases of the project and had asked Christopher to prepare a contract reflecting this authorization; (2) even though they never signed it, Elton and Laub had orally agreed to the terms of the August 2 letter agreement prepared by Christopher; (3) B & C proceeded with the subsequent phases of the project with Elton and Laub's full knowledge; and (4) B & C worked closely on the project with Wolf Creek representatives, as well as communicating progress on the

project to Elton and Laub. Therefore, the court concluded that the August 2 letter agreement memorialized the parties' contract, even though Elton and Laub never signed it.

 On appeal, we do not set aside the trial court's factual findings unless they are "clearly erroneous," i.e., "if the findings ... are against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *State v. Walker*, 743 P.2d 191, 193 (Utah 1987). Where evidence is controverted, we assume that the trial judge believed those aspects of the evidence and the inferences reasonably drawn from them that support his decision. *Redevelopment Agency of Salt Lake City v. Tanner*, 740 P.2d 1296, 1302 (Utah 1987). We find that the record contains substantial evidence supporting the trial court's factual findings, and agree that the August 2 letter agreement memorialized the parties' contract.

Elton argues that if the court should find that the August 2 letter agreement was the parties' contract, the trial court misinterpreted it by: (1) allowing B & C payment for subsequent phases of the project which were not approved according to the contract's terms, and (2) granting B & C $1,000 more on the first phase of the project than the agreed-upon $7,500 limit. He correctly points out that the court may not amend or change the parties' contract, relying on several cases, including *Rio Algom Corp. v. Jimco Ltd.*, 618 P.2d 497 (Utah 1980), which states that "[a] court will not enforce asserted rights that are not supported by the contract itself." *Id.* at 505.

## FEES FOR SUBSEQUENT PHASES

Elton asserts that the language of the August 2 letter agreement "provides that the approval for each phase is a condition precedent to the next phase," and that "there was nothing in the evidence which showed approval of any subsequent phase." To support this assertion, he cites the following portions of the form architec-

tural contract attached to and incorporated into the letter agreement:

1.1 Schematic Design Phase [Phase 1]

. . . .

1.1.4 Based on the mutually agreed upon program and Project budget requirements, the Architect shall prepare, *for approval by the Owner*, Schematic Design Documents consisting of drawings and other documents illustrating the scale and relationship of Project components.

. . . .

1.2 Design Development Phase [Phase 2]

1.2.1 Based on the *approved* Schematic Design Documents [developed in the first phase] and *any adjustments authorized* by the Owner in the program or Project budget, the Architect shall prepare, *for approval by the Owner*, Design Development Documents consisting of drawings and other documents to fix and describe the size and character of the entire Project as to architectural, structural, mechanical and electrical systems, materials and such other elements as may be appropriate.

. . . .

1.3 Construction Documents Phase [Phase 3]

1.3.1 Based on the *approved* Design Development Documents and any further adjustments in the scope or quality of the Project or in the Project budget authorized by the Owner, the Architect shall prepare, *for approval by the Owner*, Construction Documents consisting of Drawings and Specifications setting forth in detail the requirements for the construction of the Project.

. . . .

1.4 Bidding or Negotiation Phase [Phase 4]

1.4.1 The Architect, *following the Owner's approval of the Construction Documents and of the latest Statement of Probable Construction Cost*, shall assist the Owner in obtaining bids or negotiated proposals, and assist in awarding and preparing contracts for construction.

(Emphasis added.) The form contract also stated that "[i]f the Owner observes or otherwise becomes aware of any … nonconformance with the Contract Documents, prompt written notice thereof shall be given by the Owner to the Architect."

A contract should be construed according to its plain language. *See Crowther v. Carter*, 767 P.2d 129, 132 (Utah Ct.App. 1989). We observe that the plain language of these provisions contains no explicit requirement that approval be given in written form, unlike another provision in the same document which expressly requires written approval. This provision, section 1.7 of the form contract, states,

> The following Services are not included in Basic Services unless so identified in Article 15. They shall be provided if authorized or confirmed *in writing* by the Owner, and they shall be paid for by the Owner as provided in this Agreement, in addition to the compensation for Basic Services.

(Emphasis added.) Because we examine the entire contract and all of its parts in relation to each other and give a reasonable construction of the contract as a whole to determine the parties' intent, harmonizing and giving effect to all its terms, if possible, *G.G.A., Inc. v. Leventis*, 773 P.2d 841, 845 (Utah Ct.App.1989), we conclude that while the contractual language cited by Elton requires B & C to gain his approval prior to beginning work on subsequent phases of the contract, it does not require formal, written approval.

■ The trial court, however, found that Elton and Laub were estopped from denying that they had given prior approval to B & C's work on subsequent phases of the project. Estoppel is an equitable doctrine which precludes parties from asserting their rights where their actions render it inequitable to allow them to assert those rights. Estoppel requires proof of three elements: (1) a statement, admission, act, or failure to act by one party inconsistent with a later-asserted claim; (2) the other party's reasonable action or inaction based upon the first party's statement, admission, act, or failure to act; and (3) injury to the

second party that would result from allowing the first party to contradict or repudiate its statement, admission, act, or failure to act. *CECO Corp. v. Concrete Specialists, Inc.*, 772 P.2d 967, 969–70 (Utah 1989); *see also Hunter v. Hunter*, 669 P.2d 430, 432 (Utah 1983); *United Am. Life Ins. Co. v. Zions First Nat'l Bank*, 641 P.2d 158, 161 (Utah 1982); *Utah Dep't of Transp. v. Reagan Outdoor Advertising, Inc.*, 751 P.2d 270, 271 (Utah Ct.App.1988); *Hertz v. Nordic Ltd.*, 761 P.2d 959, 962 (Utah Ct. App.1988).

■ Elton argues that the trial court incorrectly found that he was estopped from denying authorization to B & C to provide services beyond the first phase of the Wolf Creek project. We disagree because we find that this case constitutes a "textbook example" of the appropriate application of the doctrine of estoppel as stated in *CECO*.

First, Elton's and Laub's conduct in: (1) orally approving B & C's phase one plans and authorizing it to proceed on the subsequent phases of the project; (2) failing to object to B & C's work on subsequent phases of the project for a period of more than six months; and (3) admitting periodically that B & C's work was good and that money was owed to B & C for its services, is clearly inconsistent with their later-asserted claim that they had not authorized B & C to proceed with the project. Second, B & C proceeded with the subsequent phases in reliance upon Elton's and Laub's conduct. Third, if this court were to allow Elton and Laub to repudiate their verbal approval of phase one and authorization to B & C to proceed with the subsequent phases, B & C would be damaged to the extent of $50,000, the difference between the initially authorized charge for phase one of $7,500 and B & C's total fee of $57,500. Thus, all the elements required to prove estoppel are met.

We note that B & C had no reason, prior to bringing suit against Elton and Laub, to believe that it had not been authorized to proceed with the project or that Elton and Laub would not sign the letter agreement which they had requested Christopher to prepare. We agree with the trial court that Elton is estopped from arguing that B & C proceeded with work on the project without his prior approval and, consequently, that his argument that the trial court misinterpreted the contract is without merit. Therefore, we affirm the trial court's judgment in allowing B & C to recover fees for the work it performed on subsequent phases of the project.

## $1,000 ADDITIONAL CHARGE

Elton also argues that the trial court misinterpreted the contract by granting B & C $1,000 more on the first phase of the project than the agreed-upon amount of $7,500.

On March 4, 1982, the parties executed a letter agreement authorizing B & C to proceed with the first phase for a fee not to exceed $7,500. Even though B & C's hourly fees ultimately exceeded this agreed-upon limit, B & C initially only charged Elton and Laub this $7,500 fee.

The disputed $1,000 increase came about as a result of changes in mechanical and engineering design. The trial court found, pursuant to a prior telephone conversation between Elton and Christopher, that Christopher sent a letter agreement dated November 26, 1982 to Elton. This letter amended the original agreement set forth in the August 2 letter to reflect increased fees based on the design changes, increasing the phase 1 fee by $1,000 and the phase 2 fee by $7,000.

■ The August 2 letter agreement requires that additional services, including "[m]aking revisions in Drawings, Specifications or other documents when such revisions are inconsistent with written approvals or instructions previously given," and "[p]reparing Drawings, Specifications and supporting data and providing other services in connection with Change Orders to the extent that the adjustment in the Basic Compensation resulting from the adjusted Construction Cost is not commensurate with the services required of the Architect," shall be provided only if "authorized or confirmed in writing by the Owner."

The design changes apparently resulted in revisions in the specifications which made them inconsistent with the previously approved design. Although the record indicates that the design changes were made on the basis of oral discussions between the parties, there is no formal written authorization of these design changes. The trial court found that "Elton and Laub neither executed the amendment nor communicated their acceptance of the amendment," but, nevertheless, awarded the additional $1,000 to B & C. However, a letter to Christopher, signed by Elton and dated February 23, 1983, states that "[w]hen Wolf Creek goes to bid on the Recreation Center, we should have incorporated the mechanical systems change you discussed with Scott." Because we find only one mechanical design change referred to in the record, we conclude that it is the one upon which the November 26 amendment was based, that this letter refers to it, that this letter serves as Elton's written confirmation of the design change because it assumes incorporation of the design change into the finished structure and, therefore, that the trial court's finding that Elton and Laub did not communicate their acceptance of the amendment is clearly erroneous.

Under the express terms of the contract, which state that such additional services, once confirmed in writing, "shall be paid for by the Owner as provided in this Agreement, in addition to the compensation for Basic Services," Elton is liable for any additional expenses resulting from the design change. Therefore, we affirm the trial court's judgment finding him responsible for the additional $1,000 charge.

Affirmed.

BENCH, J., concurs.

ORME, J., concurs in the result.